May it please the Court, my name is Sean Malone, here on behalf of Plaintiffs' Appellants. I'll try to reserve five minutes for rebuttal, but I'll keep an eye on that. This case takes place in the dry, harsh climate east of the Cascades in Yematilla National Forest, where trees grow slower and ecosystems are less resilient to impacts from logging. In this particular area, there's been historical and extensive logging, which precludes the recruitment of large snags. Try to keep your voice up, would you, Counsel? Yes, Your Honor. There's been historical and extensive logging, old-growth logging, in this area, which precludes the recruitment of large snags in much of this dry forest, so much so that the watershed assessment for this particular area at Excerpts of Record 364 states, the primary concern is whether there's sufficient old-growth and deadwood habitat, and that's snags, to maintain viable populations of more than 60 species that require these habitats. Do you take issue with the three large snags per acre standard? I believe that that's the, according to the Forest Service, that's the best available science to ensure viable populations of primary cavity excavators, and pursuant to the east side screens, which requires this best available science, that's what the Forest Service, that's the metric that they're using to ensure that. And my question is, do you take issue with that? I believe that that's the standard that should be being applied here. Okay. So, no, I don't take issue with that. All right. So, of these 60 species that the Forest Service has made a concern about in the watershed assessment and elsewhere, here we're very concerned about the primary cavity excavators because they're relying on large snags in dry forests. That precarious position that they've been in as a result of this old-growth logging that's precluded much of the recruitment of large snags has been exacerbated by decades of the Forest Service implementing this flawed technique that was outlined in our briefs, and the Forest Service now acknowledges, at excerpts of record 391, that they need to retain a far higher number of large snags on these dry forests. And that higher number, as Judge McGeough pointed out, is the three snags per acre standard. And to be sure that it's three snags per acre, excerpts of record 119. If you don't object to the three snags per acre, why are you telling us that the Forest Service did something worse in the past if it's not doing so anymore? I think the point is that because if the Forest Service is saying that you need three snags, three large snags per acre in dry forests to maintain viable populations, and then we look at the data that's been presented for this case across the project level, we only have 1.1 large snags per acre in dry forests. But we don't have to consider what they did before they adopted three snags, do we? I think right now they're not meeting that standard. Well, I'm trying to figure out what do you want the Forest Service to do? Because it could have easily set a lower standard, but it didn't. So I'm just trying to figure out what you want the Forest Service to do, because it seems like your position is discouraging the Forest Service from ever setting sort of aspirational type of standards. Well, I think the three large snags per acre standard comes from the best available science. So I think to the extent that that would have been inconsistent, a lower standard would have been inconsistent with the best available science. They could not have done that. And I'm not in no way trying to discourage the Forest Service from retaining that three large snags per acre standard. But what would you have them do on those units where they concede and you concede that they're below three snags, they're not cutting the snags within the units, they're leaving larger trees so that they'll turn into snags. So what is it that you would have them do in those units? One particular issue is that they've taken an amendment to the east side screen's requirement that requires the Forest Service to retain old-growth trees 21 inches DBH and greater. So they are actually logging old-growth trees, that is, trees greater than 21 inches DBH. That is something that we would like the Forest Service not to do, because that precludes future recruitment of large snags on the project and throughout the forest. They should not cut any old-growth trees, 21 inches or more, any? If you cut trees greater than 21 inches DBH now, you are going to preclude those trees from naturally dying and becoming large snags in the future on these dry forests. So that is one issue that my clients would like not to happen and which would raise that standard in the future. So I think that's, if they're trying to meet this standard of three snags per acre, but at the same time, three large snags per acre, but at the same time they're removing large trees in various portions of the project, then I think that that is inconsistent. If they were to leave those trees, then those trees could die naturally and become large snags to ensure population viability in the future. Can we talk about the pack fish standard and the allegations you make with respect to the RHCA tree removal? I guess you're arguing that they did this under the timber removal standard, not the fuel management standard, and that's a problem. Is that correct? Yes, Your Honor. I think the fundamental point there is this all arises in the administrative context, and what the Forest Service puts forth with its position below is very important. I think the seminal case on that perhaps is SEC v. Chanery from the U.S. Supreme Court, stating that one of the most, summarizing here, not an exact quote, but one of the most fundamental principles of administrative law is that we assess the agency's action by the rationale that they gave at that time, not a later rationale. It's pretty clear in the cases we cited in our briefing that to take a different position, set forth a new rationale on appeal constitutes a post hoc rationalization, and it's pretty clear that the only justification that the Forest Service gave in the EIS, in the record of decision, which is where that rationale needs to occur, was based on this timber management standard, TM1, and instead of actually applying an exception, or instead of applying an exception, there's two exceptions there, TM1A and TM1B, the Forest Service just said, and I quote, there's a special exception, but there is no special exception except for these two exceptions, and that's what they justified it based upon. But aren't they pretty, I mean, I'm wondering if this distinguishes it from the case that you decided, aren't they pretty consistent throughout their proposal that they're doing this for fuel management purposes, I mean, to avoid fires, I mean, there's several references as to why they're submitting this proposal. It's, if we look at it and what they're explicitly saying, they set forth a timber management standard, and then they say, here's an exception to that standard. No, and I know that, but I'm asking, I mean, do we ignore all of the other multiple references as to their purpose? I understand what you're saying. And so, for example, in TM1A, that's the exception to the Timber 1 Management Standard, it talks about after a catastrophic event such as, I think it even mentions volcanoes or you might say fire, but it lists various catastrophic events that may occur that then allows logging to occur after that. So it's not clear that if they were attempting to justify it under the TM1 standard, that they very well could have been misreading the TM1A exception in doing so and inciting fire management, but that TM1A is fairly clear, in my opinion, that it says it occurs after this catastrophic event. And the rationale for that is that we really do want to retain this canopy cover, the shade over these streams, given what's happened in the past. And so this sort of proactive management of this area would be inconsistent with that. But then if we put aside the post hoc rationalization argument and we just say, okay, let's look at the FM1 standard, that's the fire management 1 standard that this new justification is falling under, you can only do so if it, the language from Packfish states, so as not to prevent attainment of RMOs, that's the Riparian Management Objectives. One of those Riparian Management Objectives is no measurable increase in water temperature. Well, don't we have to defer to the Forest Service's scientific analysis of that? And didn't they determine that there wouldn't be a measurable difference? Well, they've taken contradictory positions as far as I can tell here. At excerpts of Record 131, Your Honor, they state that water temperature increase in the tributary due to this project would be expected to be small. That doesn't mean that it's not measurable. And I think the case that's very much on point with regard to this is what Judge Milan Smith said in Oregon Natural Resources Council v. Goodman, in which he said there is no de minimis exception to NFMA. He said regardless of whether it's a large violation or a small violation, there's no de minimis exception. And so the Forest Service's attempt, I mean, it's kind of an interesting notion that you can have a sort of, a increase in temperature that's not measurable to a degree presents some sort of perhaps philosophical issue. But I think the other point here is that they've conceded that this small increase in temperature will occur for 10 to 20 years, that that's the effect of the time it would take for the canopy cover to grow back and the shade to then take care of, start shading that stream again, as well as for the basal area of the trees that would be removed to grow back. And, again, that's on excerpts of Record 131. There's actually three statements on that page, excerpts of Record 131, where they say that it'll be a small increase in temperature. And so, again, I think the case on point there is O&R C.V. Goodman, no de minimis exception. So I don't think deference is required under those circumstances when there is a conceded, albeit small, increase in temperature. So would you move to the steppe shrubland issue? Yes, Your Honor. And can you tell me just geographically, is the steppe shrubland interspersed throughout the road area or is it in one particular location? I don't think it's not in one particular location, Your Honor. It really comprises various, it comprises meadows, for example, and talus areas. And so it is not in one simple location, but it does comprise one quarter of the project area. And I think what that really comes down to is the justification given for excluding those 300-foot buffers is future hazard tree logging. This steppe shrubland habitat that we could say is substantial in the project area, one-fourth, 5,000 acres roughly, that has less than, it's characterized by less than 10% cover. And so that undermines this one-size-fits-all rationale for excluding these 300-foot buffers from potential wilderness area consideration. And I think the second argument that the Forest Service and interveners have raised is that this was done in order to have an easy on-the-ground identification of boundaries and so forth. And the way I would respond to that is to say, is a hard look under NEPA supposed to be easy? I think the answer to that should be a little self-evident given just the hard look. But just to identify what a hard look is, courts have done that repeatedly in the past, and we've done so in our brief. It's a discussion of adverse impacts that does not improperly minimize negative side effects. So if we are excluding these 300-foot buffers, then I do believe that we are minimizing negative side effects by not taking those areas into consideration for potential wilderness area designation and consideration. And, again, a hard look is also referred to as a thorough environmental analysis. And I think if we just do a one-size-fits-all application, then we are not satisfying that hard look requirement. What do you think is the reason why the Forest Service is excluding these 300-foot buffers from potential wildlife designation? Potential wilderness designation. I think the reason is I don't think there's any ulterior motive than what they've said, which is that they would be during road improvements and so forth and to remove hazard trees that might fall into the road. They just say that all roads, we're going to say that we'll remove a 300-foot buffer. But for these step shrubland habitat that don't have trees there, that argument is just undermined completely. And then, again, the easy on-the-ground identification, that's, I think, the other reason they're doing it. And I don't think they have any other ulterior motive than those. But if we think of this, what it really comes down to is that they're not considering the unique nature of this forest when doing this. And I think if we analogize that to, let's say, the wildlife context, it would be something that I've never seen before to sort of take into account the unique nature of a particular forest when analyzing impacts to the spotted owl or to some other wildlife. But for some reason here with roadless areas, we're willing to just do this easy on-the-ground, one-size-fits-all application. And I see I'm at about four and a half minutes. So if there's no other questions, I'll turn it over. Thank you. Good morning, and may it please the Court. Nina Robertson on behalf of the United States Forest Service. With me at council table is Scott Horngren, representing the Defendant Intervenors, Asotin County, and American Forest Resource Council. And I'd like to reserve six minutes for Mr. Horngren. This Court should uphold the Forest Service's approval of the South George Fields Treatment Project. The project is important for forest health, and it complies with NFMA and NEPA. Unless the Court would prefer otherwise, I'll first address the plaintiff's viability arguments. Critically, Your Honors, I think it's important for the Court to understand that there is no viability standard that applies at the project level. And this is really the crux of the plaintiff's argument here. The forest, in stating that it would attempt to retain three snags per acre, was not establishing a viability standard that applied throughout the project level. So therefore, even though there's averages in the project area that are below three snags per acre, that does not mean that in harvesting some snags, the forest is violating any viability standard. Well, do you agree that if you go forward with this plan, there will be a period of time when the best science requirement of three snags per acre will not obtain? Your Honor, the best available science does not require that there be three snags per acre. The best available science has instructed that this should be a design criteria at the forest level, and the Forest Service, in its discretion, decided that it would aspire towards that average. All right. But it's not clear that in all the harvest units you would necessarily go below three snags per acre. What the best available science requires is that the forest manage the forest towards its historic range of variability. And as you can imagine, throughout a particular area, there's different densities and different harvest units. There may be, as one of the figures in the record demonstrates, Figure 3-9, in some areas there are more than three snags per acre. In those units, there will be harvesting of snags. In places where there are less than three snags per acre, the Forest Service will not harvest any snags. So what the Forest Service has really done is set a uniform three snags per acre aspiration throughout the area, but the best available science doesn't require that all those three snags be maintained throughout the area in order to ensure viability. But there will be periods of time when there will not be three snags per some acres, right? In certain areas, Your Honor, there will be less than three snags per acre in certain harvest units. And how do you propose the three snags per acre standard or aspirational standard will be developed over time? Well, what will happen, Your Honor, is that in the harvest units where there are more than three snags per acre, harvesting of snags will be allowed. In places where there's currently less than three snags per acre, there will be no harvesting of snags. And how will you get up to three snags per acre in the latter area? Over time, Your Honor, what the project contemplates is that trees will be left that will turn into snags in the future. Also, there will be smaller snags left. How long will that take? Your Honor, it's actually not stated in the record. It's unclear, but it depends on sort of the forests. It depends on many factors in the forest how long it will take. Will it take longer than the lifespan of the birds who won't have snags? Your Honor, that is also unclear and not in the record. I don't want to misstate anything to the Court. But what I will say is that, again, this three snags per acre is not required for population viability. So there will be some areas where the three snags per acre will not be met during the lifespan of the birds who use the snags? Again, Your Honor, I don't want to make any misstatements. That's possible. But what I want to emphasize is that the Forest Service never made a finding that three snags per acre was required to ensure viability of those populations. What actually the plan requires is much lower than three snags per acre. It's .14 snags per acre. And what the Forest Service has done using the best available science is design the project to, as Judge McGee, I believe, said, aspire towards more. But it never made the finding that these were critical for population viability. In fact, the Forest has implemented many measures besides snag retention to ensure that the population of these birds will remain viable throughout the forest. It's done things like retain snags as well as retain certain green trees, preserve old growth in certain areas. And all of those collectively, all of those measures taken together collectively will ensure that the viability of the population remains at the forest level. Where do you find the .14 snags requirement? So, Your Honor, if you look at excerpts of record page 170, ER 170, you'll see in the chart there that the .14 requirement is, if you look at the table, table 369. For Ponderosa Pine, if you go over average snag density, .14, that's a forest plan standard. And that was based on a snag analysis, interim snag guidance, rather, that was established back in 1995, which is also in the excerpts of record. Again, the Forest Service was aspiring towards more here based on the best available science and managing this particular area based on site-specific conditions towards the historic range of variability. And that's completely contemplated by NIFMA and permitted. What we emphasize, again, is that the plaintiff's statements that there's a viability standard of three snags per acre, it's just simply untrue. And therefore, the court should not hold the Forest Service to that standard. I wanted to ask you, why didn't the Forest Service just say which PACFIS standard applied? Your Honor, the Forest Service repeated in all places that it was describing what was happening on these 25 acres as fuels treatment, and it was not required to establish that standard. Admittedly, it perhaps could have been clearer if it had said FM1. It's clear. It's kind of confusing, actually, because the only thing that is specifically referenced is the timber harvest standard. And, Your Honor, that reference... And then you have the special exception under the timber harvest standard. So I'm actually quite perplexed, even noting all the references to what the purpose is, why the standard was not explicitly referred to with respect to fuel management if that's the standard, if it's so clear. Your Honor, the Forest Service emphasized fuels treatment throughout and thought that to be sufficient. And, again, the standard to which this Court should hold the Forest Service is whether or not its rationale was reasonably discernible. That's the level of review here. You didn't answer my question, though. Why didn't they just refer to the fuel management standard explicitly? Your Honor, again, because the Forest Service, I think, took for granted that it was clearly stated that it was using fuel treatment, it didn't see a need to state that explicit standard. What concerns me, and I'm sure you're familiar with the law, that we have a fair amount of law that says that an agency is required to set forth its basis with such clarity as to be understandable. And then we are not expected to chisel that which must be precise from what the agency has left vague and undecisive. That's from SEC v. Chenery. It seems like you're asking the Court to do that somewhat here because your references are only to the timber harvest standard and never to FM-1. Your Honor, we're not asking the Court to chisel out any particular rationale because in all places where this particular part of the project was described, it was described as fuels treatment. It was the rationale. Why isn't that post hoc rationalization? Because, Your Honor, fuels treatment is what is contemplated in the FM-1 standard, and that is how the Forest Service described its project. The agency is not required to always in all instances state the specific standard under which it's operating. Rather, it's supposed to explicitly explain the rationale, and the rationales here match up. But it kind of cuts both ways. If it's so clear, why not refer it to the fuel management standard? Your Honor, I guess I would emphasize that in drafting these documents, the Forest Service is operating from a position on the ground of what the objectives are of this particular project. They see it as fuels treatment. They know that fuels treatment is allowed under the FM-1 standard, and in some ways it seems so apparent that no statement of the standard was even needed. Well, but then you put a standard of the timber instead. That was stated, Your Honor, perhaps because that standard has an explicit prohibition and then exceptions within it, and the Forest Service wanted to show clearly that it was not operating under that standard. In fact, it wasn't because, of course, there will be no commercial harvest from this area. Again, I would emphasize that although chainery has the language that you quoted, there's numerous, there's a case law throughout this circuit, for example, Alaska Department of Environmental Conservation, where the court has said so long as the agency's rationale was reasonably discernible, it should be upheld, and that is what we have here, Your Honor. Again, throughout the record, the Forest Service has described this as fuels treatment. It has emphasized the need for harvesting in these areas because they pose a fire risk, and in fact, even on ER, I'll direct, Your Honor, to ER 203, where the project is described, where the Forest Service has stated that the school fire that occurred in the area was exacerbated by fuel buildup in these riparian areas, and for that reason the Forest Service wanted to do fuels treatment or thought it necessary to do fuels treatment here. This, Your Honor, is sufficient because fuels treatment is what is allowed under the FM1 standard. Can I move you to the third issue? Tell me how the failure to discuss the stepped shrubland habitat constitutes a full and fair discussion of the environmental impacts of the 300-foot buffer. Your Honor, the Forest Service conducted a thorough review of potential wilderness areas, and it wasn't required under the wilderness criteria that are set forth in its own handbook to consider unique shrubland as the plaintiff's state here. That's just not a requirement. That's not part of the wilderness criteria, the wilderness inventory criteria, that the Forest Service was operating under here. Isn't it a quarter of the land that was affected by this buffer zone? Your Honor, it is a quarter of the land, but again, the fact that it exists or the fact that it is, as the plaintiff's alleged, unique, which is, again, not established in the record and disputed, is not relevant here. What the Forest Service did was it followed very carefully the handbook guidance on inventory criteria. It followed it step by step and even went above and beyond in other parts of the record examining the impacts of this project on other wilderness areas. The Forest Service first looked at all potential polygons. It used on-the-ground knowledge, and it reasonably concluded that these roadside lands that were within 300 feet of the road should not be considered because of the past harvest that existed there. To the extent there's not past harvest in all of the shrubland area, that is irrelevant because the exclusion still makes sense because of the easy on-the-ground identification requirement or need here. As was established earlier, this shrubland is dispersed throughout the area, so to allow a 300-foot roadside set-aside or exclusion for a forest and then have to weave the boundary in and out as shrubland appears is just simply not going to facilitate easy on-the-ground identification. And you made the argument in your brief about that this land wouldn't end up being part of a wilderness designation anyway. Can you explain that? Yeah, Your Honor, so it's perhaps what would be most helpful is a map, but what in the map that is especially illustrative here appears on the supplemental excerpts of record in 454, where you can see that even if we had included those 300-foot areas, there would still be another basis for concluding that there was no potential wilderness area in these polygons. And that is because the shape of the polygon is such that there are particularly, there are fingers that extrude from sort of the main mass that would have rendered this particular wilderness area that exceeded the 5,000-foot threshold unmanageable. And so the Forest Service even had a separate basis for excluding the particular polygon that would have exceeded the 5,000-acre requirement had the roadside lands been included. You were leaving six minutes for the council? Yes, Your Honor. I just had one quick, I just wanted one quick question for you, just following through on the standards. Does the project meet the Packfish Timber Harvest Standard? Your Honor, the Forest Service did not rely on that. There's no commercial harvest happening, so that standard just doesn't apply. There will be no timber harvested from this area, so it's just an irrelevant standard here. Even though that's the one they cited. That's the one they cited, and that's the one that they said explicitly didn't apply. But your answer, if it did apply, your answer would be no, it wouldn't comply? Well, there's no evidence of the record. There's certainly an arguable point as to whether or not one of the exceptions could apply because the Forest Service was doing this for fuels treatment. The rationale throughout has been proactive fuels treatment, and so therefore the FM-1 standard is the one that applied here. Do you agree that it would not be met if it applied? If the TM-1 standard applied, I don't want to overstate because it just hasn't been the rationale and the record is not there. But certainly, Your Honor, because the FM- Can you answer the question? Maybe you can't and say you can't. I can't answer the question, Your Honor. You can? I cannot. Then it's fine. Thank you. You should have said that about two minutes ago. Apologies. This is the map. It's a photo map from supplemental excerpts of record 454 that counsel was referring to, federal government's counsel. May it please the Court, I'm Scott Horngren on behalf of Asotan County and American Forest Resource Council. I don't want to spend a lot of time on this issue, but just to point out when you look at this map, you can see the gradation between forest and non-forest isn't explicit necessarily. And in the upper right-hand corner, you can see some of the trees sort of bleed into the non-forest area. So our position is the Forest Service was not arbitrary and capricious in making a simplifying assumption, saying that all those areas within 300 feet of a road where there's going to be activity and a lot of people really aren't compatible necessarily with wilderness and solitude. So that's where we're at on that one. On the riparian habitat conservation area issue, one thing I think the briefs point out that we'd like to emphasize is we're looking at 25 acres in this whole multi-thousand acre project where the Forest Service is trying to do a test. Judge Maguria said, well, there's no reference to TM1 or FM1 or the pack fish standards, but we would say a rose by any other name would smell as sweet. If you look at the record, they explain that the... Well, the record shows that the riparian management objectives are pool frequency, water temperature, large woody debris, bank stability. That's what they're trying to do in terms of protecting these riparian areas and enhancing them. At Supplemental Excerpt of Record 423, there's a page where the Forest Service explains why they're treating this area. And they explain that they want to treat these 25 to restore and maintain stream shade, bank stability, soil erosion, stream turbidity, stream nutrients, and large wood inputs. And we would argue that they were not arbitrary and capricious in concluding this is how they wanted to treat those areas. And in their detailed explanation of what they're doing, it's consistent with pack fish. What's your response to Mr. Malone's argument that even a de minimis effect on the river temperature is a violation? We would cite the McNair cases where, in the context of wildlife, for example, they said if a de minimis reduction in wildlife habitat were somehow a violation of the National Forest Management Act, the Forest Service never could do anything. So Soton County doesn't accept that it's the law that a de minimis reduction in any of these is necessarily a violation of NFMA. And turning to the viability issue, the record is not a model of clarity about this viability standard and whether it applies at the forest plan level, the project level, the unit level, the management area level. We would suggest, though, that if you look at the Act itself, it emphasizes to provide for diversity in plant and animal communities based on the suitability and capability of the specific land area. And Judge Oreck, in your earlier questions, you said, well, what if they don't have the trees? And you were saying, gee, there's not three trees per acre, but if the lifespan is never... We're talking about a situation here where the trees aren't there. And if you buy plaintiff's argument in this case, you couldn't do anything on this land because you wouldn't have met the standard if you accept three as a standard. Well, you could plant some more trees so that they could die and they could be snags. That's right. But even better than that, what the Forest Service decided is for most of this project, it's a partial thinning. And there are live trees being left. And how long are the trees going to... or when are additional snags going to be provided? They will be provided as soon as they grow big enough. And by thinning them, the Forest Service wants them to grow bigger faster because they're not competing for light and nutrients with the other trees that are removed. And so we hope you would reject the conclusion that the Forest Service can't do anything here under the reading. Even in C4, which is the wildlife prescription, they say within the wildlife habitat objectives, this is from the Forest Plan, protect forest stands by practicing prevention activities. Emphasis will be on prevention of stand and fuels conditions that favor pest increases above epidemic levels. Aggressively suppress insect and disease using cost-efficient strategies. That's part of C4. That's part of the penelope of standards that the Forest Service is trying to meet. And I'll conclude by saying the other provision of the National Forest Management Act or the other phrase in that, provide for plant and animal diversity, says in order to meet multiple use objectives. And so you need to read it as a whole. It's based on the capability of the land, which in some cases we don't have here. So we'd urge you to affirm the Forest Service. Mr. Malone? Thank you. The first response I would have is that on page 41 through 42 of plaintiff's opening brief, this sets forth the citations where they're going to be logging trees greater than 21 inches DBH. That states that ER 210.1, and I quote, trees over 21 inches DBH will be removed from the dry upland forest portions of the project area. And then, again, at ER 175, some trees greater than or equal to 21 inches DBH would be removed in dry forest. So it just doesn't make sense that this project, why this project if they're attempting to aspire to this three acre large snag, three large snag per acre standard, why it's actively removing these large trees that would otherwise become snag, large snags in the future. And then to sort of just briefly review this whole issue about a .14 per acre snag standard, that's what the forest plan, that's that flawed technique that the forest plan has been relying on for just about three decades. And I think that's why we're in this precarious position of having so few large snags. And if you go to that table at excerpts of Record 170, the paragraph just below that table sets forth, it's citing this Rose study from 2001 that says this is a flawed model. We should not be using it. The best available science will not support this anymore. And that's when they propose the three large snags per acre standard in order to then provide for population viability. Is it your position that they must provide a three snag per acre population during all times? They can't have at any time less than three snags per acre? If they want to provide for viable populations of these primary cavity excavators, then that's sort of what they need to do. I mean, if you start falling below that. Is the answer yes? Yes, Your Honor. And so I think one other thing that we want to take into consideration that I put in my brief was a request for judicial notice of the fact that currently the Umatilla National Forest is going through a forest plan revision, and I've seen that, and I don't see these provisions surviving that. So I don't think a ruling in favor of plaintiffs will create this far-reaching precedent that would never allow logging on the forest again. This is perhaps the last opportunity to hold the Forest Service accountable for the fact that there have been decades of removal of these large trees and failure to recruit these large snags. So that's why I put that in there, to demonstrate that this will be changing soon. The forest plan itself will be changing soon, and as it is with many of the forest plans, they're not retaining these viability provisions. So just to move on to the pack fish issue, just as plaintiffs have to raise issues before the Forest Service so the Forest Service knows what plaintiffs are pointing to, it goes both ways. The Forest Service should put someone who's participating in the administrative process on notice of what they're trying to do, what standard they're relying on. And if they say TM1 and my clients look at TM1 and say, that doesn't make any sense, you're not satisfying that, and then later on they say FM1, well then how were my clients ever supposed to know to talk about FM1? We probably would have, we didn't talk about FM1 because the Forest Service talked about TM1 the whole time. So this notion of waiver, raising issues, I think in this context it kind of goes both ways to allow plaintiffs and people who participate in the administrative process to know what the Forest Service is doing. And then as far as the roadless area issue, I guess the only thing I would say about that is, first of all, it's a legislative decision when to actually designate wilderness and it's the Forest Service's job to retain various areas within this wilderness area study areas in order to, that a legislative decision could be made. And the Wilderness Act does not require that there be over 5,000 acres. That's Lands Council v. Martin. And I see I'm out of time right now, so unless there are any further questions. All right. Thank you. Thank you. All right. The case of Land Council versus U.S. Forest Service is submitted and council thanks for their presentations. And that will conclude our calendar for today and the court stands adjourned until tomorrow morning at 9 o'clock.
judges: Orrick, Bea, Murguia